### Case No. 4,542.

#### The ETNA.

[1 Ware (462) 474.][1]

District Court, D. Maine. Nov. 20, 1838.

---

[1] [Reported by Hon Ashur Ware, District Judge.]

S. Fessenden, for libellant. Mr. Haines, for respondent.

WARE, District Judge. The first question, which is presented by the case, arises on the admissibility and effect of Joseph Walker's receipt in full for the wages claimed in the libel. It is said that the father being entitled to the earnings of his child by virtue of his paternal power, and the wages being a debt due to him, in his own right, he had full authority to compromise and settle the suit on such terms as he pleased, although the action was not brought in his name. As a general proposition, it is undoubtedly true that the father is entitled to the earnings of his children during their minority, nor is there any doubt that he may maintain a suit in the admiralty for their wages earned in a maritime service. Plummer v. Webb [Case No. 11,233]. But this is not, like the duties of a parent, a right which is indissolubly attached to the paternal relation. It is a right which may be either renounced by the father, or forfeited. He may renounce it by voluntarily allowing his child to have the exclusive use of the fruits of his own industry; and he may forfeit his right by neglecting to perform those parental duties which are the foundation of the right. It is the duty of the father to provide for his child a home, to protect, to maintain, and to educate him according to the measure of his ability. It is to enable him to do this that the law gives to him the custody and right of control over the person of his child; and, as some compensation for it, allows him to take the fruits of his child's labor. But this paternal power is not of the nature of a sovereign and independent power. It is subject to the restraints and regulation of law. Upon the principles of the law of nature, as well as of the municipal law of this country, it is inseparably connected with the parental obligations, and arises out of them. It is not a power granted to the parent for his benefit, but allowed to him for the benefit of the child, and it ceases when the faculties of the child have acquired that degree of maturity, that it may safely be trusted to its own resources. When, therefore, the parent abuses this power, or neglects to fulfil the obligations from which it results, he forfeits his rights. If instead of treating his child with tenderness and affection, and bringing him up in habits of industry, sobriety, and virtue, he treats him with such cruelty that he cannot be safely left in his custody; or corrupts the purity and integrity of his nature and trains him up to immorality and profligacy, the protecting justice of the country will interpose and deprive him of the exercise of a power, which having been allowed for the benefit of the child is perverted to his injury and perhaps his ruin. There are many cases in which the court of chancery in England has interposed its authority and taken children from the custody of their fathers who have abused their parental power, and placed them under the care of persons proper to have the control of them, and to superintend their education. 2 Story, Eq. Jur. c. 35; De Manneville v. De Manneville, 10 Ves. 52; Whitfield v. Hales, 12 Ves. 492; Wellesley v. Wellesley, 2 Bligh [N. S.] 128. I am not aware that any doubt exists that the courts in this coutry have similar authority. It would certainly be a great defect in the laws of any civilized people, if they furnished no mode by which the innocence and helplessness of infancy, and the purity and ingenuousness of youth could be protected from the brutality of an unnatural parent. The community has a deep interest in preserving the rectitude of the young, and in imparting to them such an education and training them to such habits as will render them in manhood useful and not pernicious members of society. As a father may forfeit his right to the custody and control of his child's person by abusing his power, so by neglecting to fulfil the obligations of a father, he may forfeit his right to the fruits of his child's labor. If he provides no home for his protection, if he neither feeds nor clothes him, nor ministers to his wants in sickness or health, it would be a most harsh and unnatural law which authorized the father to appropriate to himself all his child's earnings. It would be recognizing in fathers something like that preëminent and sovereign authority which has never been admitted by the jurisprudence of any civilized people, except that of ancient Rome, whose law held children to be the property of the father, and placed them in relation to him in the category of things instead of that of persons.[2]

---

[2] Gaii, Comm. Lib. 1, 55; Just. Inst. 1, 9, 2; Poth. Pand. 1, 6, 16. The law gave to a Roman father the same form of action for the recovery of his goods, his cattle, or his children. In so strict a sense were they held by the primitive law of the state to be in the dominion of the father as property, that he might bring an action in rem (rei vindicationem) for their recovery, alleging, as this right was peculiar to a Roman citizen, that it was brought ex jure Quiritium (Dig. 6, 1, 1, § 2), or he might have the action of theft; and although the general language of the law was "liberi hominis nulla aestimatio est," he recovered double damages. As a domestic judge, he had over them the power of life and death, and might sit in judgment and inflict upon them the last punishment, without referring the cause to the public magistrate. He might sell his children as he could his slaves, and what is more extraordinary, if the child by any means became free, he was authorized to retake him and sell him a second and third time. It was not until the child ac-

Keeping these principles in view, let us look to the facts in this case, as they have been proved by unexceptionable witnesses. A number of persons have been examined who have been acquainted with Joseph Walker and his family from one to four years, or more, and who have testified to the kind of care which he took of his family, to his habits, his temper, and manner of life. During that time, although constantly residing in the same town, and his place of employment, where he worked at his trade, not being more than half a mile from the residence of his wife and children, he has never lived with them except in some portion of the winter season when he was unoccupied in his trade. The witnesses testified that he never visited his family oftener than once a week, and seldom oftener than once a fortnight, when he came home on Saturday nights and spent Sunday. That on these occasions he often returned in a state of intoxication, when he abused his children with such excess that they have been seen, when their mother happened to be from home, flying from the windows to escape from his violence, and the younger ones have been taken by a family residing in another part of the house, to save them from the brutality of their father. That during this period he has done nothing towards the support of his children, except that he sometimes brought some small articles of provision into the family, but less, as the witnesses testify, than he himself consumed in these fugitive and unwelcome visits. The whole burden of providing for the family has been thrown upon the mother, who has labored to the full measure of her strength to provide a support for her children and herself, aided by a part of the earnings of such of the older children as could get employment. For this father, while he neglected all the duties of a father, was sufficiently tenacious of his supposed paternal power. When his son was at sea he took to himself a part of his wages, but he allowed a part to go towards the support of the child and the rest of the family. A few days after the son sailed on this voyage, having obtained the surplus money which was distributed among the inhabitants by the city government, he immediately without allowing any part of it to his family, left this city and has not yet returned. The force of this testimony is but very slightly, if at all weakened by that produced by the respondent, while so far as respects his habits of intoxication it is fully confirmed by the unsuspicious testimony of a physician who has known him for eight years, and who testifies fully to his habits in this particular, and has been called to visit him while suffering under delirium tremens from habitual intemperance.

Is the father, under these circumstances, entitled as a matter of right to appropriate to himself the earnings of his son? At the time when he undertook to do it, he had, as we have seen, abandoned his family. He left the place without giving them any notice of his intentions or his purposes, and they ascertained where he had gone, not from him, but by inquiries of others. The father is bound, as has been already observed, by the dictates of natural law, to support, protect, and provide for the well-being of his children, according to the measure of his ability. And if the law invests him with a right of control over their persons, it is only for the purpose of enabling him to perform more effectually and completely those duties which

---

quired his freedom after a third sale that he became independent or sui juris. The legal and solemn form of emancipation was by a fictitious sale three times repeated. Dig. 47, 2, 14, § 13; 1 Huber, Prael. lib. 4, 1, 18; Gib. Hist. Rom. Emp. c. 44; Heinn. Recitationes, No. 135, 8; Antiq. Rom. L. 1, 12, 6–9.

Among savage and barbarous tribes the father is usually invested with an unlimited power over his children. He may either put them to death or sell them into slavery, without being called to an account by any public authority. We find traces of this paternal power in the pictures which the Bible gives of the simple manners of the primitive and patriarchal ages of the world. When the sons of Jacob proposed to take with them into Egypt their brother Benjamin, the aged patriarch objected, and to overcome his scruples, "Reuben spake unto his father, saying, Slay my two sons if I bring him not to thee." Gen. xlii., 37. Nor are we to suppose that the paternal power, in the early and rude ages of the common law, was restrained within its present limits. It is not improbable that among our Saxon ancestors, as among other barbarians, the father was allowed an unlimited power over his children. It is certain that long after their settlement in England, they continued in the practice of selling their children into bondage, and even into foreign bondage. They were publicly exposed for sale in the slave market in Rome. Gib. Hist. Rom. Emp. c. 38. But this power among barbarians is limited to the period while the children reside in the father's family, and depend on him for their support. When they have attained the age of manhood and are separated from the father's family, they become independent. In the progress of civilization, and upon the institution of a regular government, this domestic jurisdiction is restrained. The individual becomes a member of the state, and the authority over him in all cases of graver importance, especially those involving life and liberty, is transferred from the father to the civil magistrate. Millar, Origin of Ranks, c. 2.

The Romans, from some causes not well understood, formed an exception to this common law of civilization. The absolute and perpetual dominion which was attributed by the law to a Roman father over all his descendants, for it extended to his grand and great grandchildren in the line of male descent, as well as to his children, is one of the most remarkable characteristics of that extraordinary people. It appears to have been coeval with the origin of the state, and continued in nearly its whole vigor down to the end of the commonwealth. Fulvius, one of the conspirators who fled with Catiline, upon being brought back to the city was without any form of public trial put to death by order of his father. Sallust, Bellum Catilinae. 39. And it was not until the reign of Maximian and Diocletian that the right of the father to sell his children into slavery was prohibited by law. Code, 4, 43, 1. A custom so remarkable could hardly fail to have left deep traces of its influence on the domestic manners and habits of the people.

are enjoined, as well by the instincts of nature and the dictates of reason, as by the law of the land. The soundest and most approved expounders of the law of nature place the paternal power exclusively on this foundation. The Creator of man, in giving to him a social nature and endowing him with those qualities which fit him for the enjoyment of social life, has imposed upon the parent, as one of the conditions of his being, the obligation of providing for his offspring while they are incapable of taking care of themselves. But his children are not on that account born slaves. They do not become the property of the parent. As soon as a child is born, he becomes a member of the human family, and is invested with all the rights of humanity. Nature has placed him under the tutelage of the parent, because this tutelage is necessary for his preservation and well-being, and has implanted in the bosom of the parent the instinct of parental love as a pledge and security for the faithful and pious execution of the trust; and, as wherever a duty is required, a grant of the powers which are indispensable for its performance is implied, the law of nature allows him just so much authority as is necessary for its execution. "The power of a father," says Puffendorff, "is that which is absolutely necessary to enable him to discharge the duties to his children which nature has imposed upon him, and consequently does not extend further than is requisite for this object." Jus Naturae et Gentium, lib. 6, c. 2, § 6; Grotius, lib. 2, c. 5, §§ 1, 7; Locke, Second Treatise on Government, c. 6; Heineccius, Jus Naturae, lib. 2, c. 3. The celebrated Hobbes, who seemed to think that children were born to no rights, as he resolves all right into that of the strongest, and who held that the relation of parent and child is that of master and slave, defends his doctrines not on the simple fact of generation, or the relation of paternity and filiation, but on the fact that the child is indebted to the parent for protection, support, and education, as it depended on his will, whether he would nurture and maintain the child or leave it to perish. If he abandons his child, he abandons at the same time his paternal power, and the right of dominion over the child passes to the first person who takes it under his protection and gives it a support.[2]

The municipal law of the country is founded upon and enforces the precepts of natural law; and the soundest and most esteemed commentators upon the common law explain the rights and duties of the parent in terms that correspond entirely with the dictates of the law of nature. "The power of parents over their children," says Blackstone, "is derived from their duty, this authority being given them partly to enable the parent more effectually to perform his duty, and partly as a recompense for his care and trouble in the faithful discharge of it;" and he adds, that the parent "may have the benefit of his children's labor, while they live with him, and are maintained by him." 1 Comm. 452, 453; 1 Woodeson, Lect. 451. The language of Chancellor Kent, in his Commentaries, is, that "in consequence of the obligation of the father to provide for the maintenance and, in some qualified degree, for the education of his infant children, he is entitled to the custody of their persons, and the value of their labor and services." 2 Kent, Comm. 290; Reeve, Dom. Rel. c. 9, p. 283; Id., c. 10, p. 290; Plummer v. Webb [supra]; Benson v. Remington, 2 Mass. 113; Day v. Everett, 7 Mass. 145. It may be true that the paternal power is sometimes described in terms more general, for men who are most accurate in the use of language, do not always, whether in speaking or writing, annex to a general truth all the limitations and qualifications with which it is to be understood. It is perfectly true, as a general proposition, that the father has the right to the custody and control of the person of his child; and it is equally true that if he abuses this power the law will interpose and take his child from him. What degree of abuse will justify or require this interpo-

ture and essence indivisible. No one can be the servant of, and bound to obey two wills, for if they should happen to disagree it would be impossible, and no one can be bound to an impossibility. This right cannot, therefore, have its origin in generation. According to Hobbes, all men are naturally equal, and they are also naturally enemies, and from these facts results the law of nature, that in a conflict of wills the victor has the right of dominion over the vanquished, or over one whom he has in his power. It follows that a child is the property of the first one who has the child's life in his power. This is the mother, and it is thus that it is to the mother that nature has originally assigned this right of dominion over her children. If she supports and educates the child, she does this upon the tacit condition that the child shall not be her enemy, nor have the right of dominion over her. But every man is an enemy to every other man, to whom he does not stand in the relation of master or slave. "Hostis autem est quisque cuique, cui neque paret neque imperat." The condition, therefore, upon which the mother nurtures and educates her child, is, that he shall be obedient to her will, in other words her slave. This according to Hobbes is the condition of man in a state of nature. He then proceeds to relate how the mother may part with this right of dominion by her own voluntary act, or by compact, transfer it to another, or how it may be modified by the laws of society. De Cive, c. 9.

[2] " 'Socrates est homo, ergo et animal,' " says Hobbes, "is a self-evident proposition because 'homo' is, by definition, 'animal.' But 'Sophroniscus Socratis pater est, ergo et dominus,' is a just inference, but not self-evident, because 'dominus' is not included in the definition of 'pater.' " He then proceeds to prove that the father has the same right of dominion over his children that he has over his slaves. He observes that this right of dominion over property is usually founded on the paternal relation or generation. But if that is assumed as the right, it will be divided between the father and mother, as both contribute to the being of the child. Now the right of dominion is in its na-

sition is necessarily a question of discretion; but no one will contend that a father, under the common law, stands in the relation of a sovereign to his child, invested like a Roman father, with the jus vitae et necis. So also it is not questioned as a general truth, that the father is entitled to the fruits of his child's labor; but it is equally true, that this is a right which results directly from the fulfilment of his paternal obligations of providing for the well-being of his child. If these duties are not performed, if he abandons the care of his children, he renounces at the same time his paternal power. There is, as is justly observed by Chief Justice Parker, no law, human or divine, short of that of absolute slavery, which can authorize the father to take to himself the fruits of his child's industry, when he has discharged himself from the obligation to support the child, or has obliged him to support himself. Nightingale v. Withington, 15 Mass. 274; per Sedgwick, Justice, Benson v. Remington, 2 Mass. 115.

But there is proof in this case that the father was, from infirmity, unable to perform the ordinary labor of a man, having had the misfortune to lose one of his legs. Now it is not intended to be said, when a parent from sickness or any other cause becomes unable to support his children, that they are discharged from the obligation of filial piety and reverence. These are obligations which follow them through life; and these sentiments are so deeply implanted by nature in the human bosom, that ordinarily no degree of neglect or unkindness on the part of a parent can entirely extinguish them. Nor is it pretended that this obligation is fully discharged by cherishing passive feelings of gratitude and affection for a parent. When a child has arrived at that degree of maturity and strength that he is able by his industry to do more than is necessary for his own support, nature imposes on him the obligation of contributing to the support of a sick or infirm parent. Provision is made by the laws of this state for enforcing the performance of this natural obligation. Laws Me. c. 122, § 5. But neither the law of nature, nor the law of the state applies in favor of a parent, who being able to support himself, as this one was, and to contribute something at least to the well-being of his family by the exhibition of feelings of paternal kindness and solicitude for their welfare, if in no other way, in the first place disturbs and disquiets them by the abuse of his paternal power, and then abandons them to the care of themselves and to the charity of their neighbors. In whatever light this case is viewed, it appears to me that Joseph Walker had neither a moral nor legal right to appropriate to himself the libellant's wages. If the payment then to him is a discharge of the suit, it must be on some other ground than that of his paternal prerogative of receiving them to his own use.

Is his discharge valid and conclusive on the rights of the minor if he be considered as acting in the character of prochein ami? What power or control the prochein ami or guardian ad litem has over the management of a suit at common law, and how far his acts may be binding and conclusive on the rights of a minor, does not seem to be very precisely settled in the books.[4] Before, however, he is permitted to assume the direction of the suit he must be specially admitted by the court for that purpose, and if he is guilty of any misconduct he may at the discretion of the court be removed and another appointed in his place. Com. Dig. "Pleader," 2 C. 1; Hargrave's notes to Co. Litt. 135, C. note 220; 2 Saund. 117f, note; 1 Coke, Second Institute, 261, 390; Tidd, Pr. 50. The authority of a prochein ami to sue for an infant, was given originally by the statutes of 1 & 2 West. Edw. I., and was designed to protect the infant against the frauds of the guardian who had the legal custody of his person. Co. Litt. 135, 136, Hargrave's note, 220; 2 Inst. 261, 290. The legal reason now, for requiring the suit to be instituted by a next friend, is to guard the rights of the minor, who is not supposed to have the knowledge and experience requisite for the management of the suit himself. But though appointed as guardian ad litem, there is reserved an ultimate guardianship to the tribunal before which the suit is pending, which will at least so far be promptly exercised, as to remove a guardian who is unfaithful to his trust. And although it is said that the minor cannot disavow the acts of his next friend, it would, I presume, hardly be contended that the acts of such next friend would be so far conclusive on the rights of the minor as to preclude the court from allowing him a remedy, if they were done in bad faith, and especially if there was evidence of collusion with the adverse party. It would seem to be, not only the right, but duty of the court to protect an in-

[4] Parsons v. Jones, 9 Mass. 106; Smith v. Floyd, 1 Pick. 275; Blood v. Harrington, 8 Pick. 552; Crossen v. Dryer, 17 Mass. 222; Reeve, Dom. Rel. c. 7. By a rule of the supreme court of Massachusetts, passed in 1784, no prochein ami was allowed to prosecute any personal action in behalf of an infant, until he should have filed a bond to the commonwealth, in the probate office, for the county, with a condition to account to the infant or his heirs, for all sums which might be recovered. But the rule, either from doubts of the authority of the court to establish such a rule, as involving an act of legislation, or from some other cause, was never observed in practice. 9 Mass. 106. By the 53d rule of the circuit court of the United States for the first circuit, it is provided, that no prochein ami shall be allowed to prosecute any action, unless at the return term he give such security as the court may direct, that the property recovered in the suit shall be faithfully accounted for to the infant or his legal guardian.

fant against the fraudulent acts of a guardian appointed under its immediate authority.

But whatever may be the power of a court of law, this is undoubtedly within the power of a court of equity. The mere filing a bill constitutes a minor, as to his interest embraced in the bill, a ward of the court, and places him under its special protection; and it will actively interpose to protect the interest of a minor against the negligence or bad faith of a guardian ad litem. Story, Eq. Pl. 60; 1 Madd. Ch. Pr. 332; 2 Madd. 280; Stephens v. Van Buren, 1 Paige, 479; 2 Story, Eq. Jur. 531. A court of admiralty is not a court of general equity jurisdiction, but its course of proceedings bears more analogy to that of equity, than to that of the common law. In matters falling within its jurisdiction it professes to decide ex aequo et bono, and to place its decrees on the broad principles of general equity. It would, I apprehend, be chargeable with a neglect of its duty, if it allowed the rights of a minor to be compromitted by the negligence or bad faith of his guardian ad litem. By the civil law from which the admiralty has in a great measure borrowed its course of procedure, minors might upon general principles be restored to their rights, in integrum, when they had been compromitted by their tutors, even when the father acted as tutor, whether this had been done in the course of judicial proceedings or otherwise. Dig. 4, 4, 29; Domat, Lois Civiles, liv. 2, tit. 1, §§ 2, 16, and liv. 4, tit. 6, §§ 2, 23, 24. "Tutor in re pupilli tunc domini loco habetur, quum tutelam administrat, non quum pupillum spoliat." Dig. 41, 4, 7, § 3. Although the minor had a remedy by a personal action against his tutor or curator, he might waive that and proceed to have the act of his tutor annulled, and the benefit of restitution to his entire rights. Code, 2, 25, 3. A court of admiralty would more readily relieve a minor when the suit is for his wages as a mariner, a class of men placed peculiarly under its protection. This court will look critically into the contracts and dealings of ship-owners, with the mariners themselves when of full age; and if it finds that a seaman has been surprised into any engagements that are inequitable and unreasonable, by the superior knowledge and experience in business of the merchant, and that an undue advantage has been taken of him, the court wil interpose its authority to protect him against his own ignorance and improvidence. The Juliana, 2 Dod. 504; Hardon v. Gordon [Case No. 6,047]; The Minerva, 1 Hagg. Adm. 347; Brown v. Lull [Case No. 2,018]. It would then be surprising if it could not protect him when a minor, and therefore still more dependent on others, from the negligence or bad faith of a next friend, if through inadvertence an incompetent or unfaithful one should happen to be appointed. My opinion is that the court has the power, and is bound in proper cases to exercise it; and of course that it is not bound to receive this receipt and discharge without looking into the circumstances and consideration under which it was taken.

Let us then examine the facts of the case. It appears that the respondent was acquainted with Joseph Walker and his family, and, therefore, may be presumed to have had some knowledge of the manner in which he fulfilled the duties of the father of a family. It was well known to him, that heretofore the father had claimed for his own use the wages of his son, and it was equally well known that his right to them in this case would be resisted. The fact that the suit was brought in the son's name, was a sufficient notice of that, if he had no other. The father's name was, indeed, rather unfortunately, as the result has shown, used as prochein ami, because the forms of law required that the suit should be brought under the nominal protection of some next friend. But it was without any intention or thought of allowing him any control in the management of the suit, as it was well known to all the parties that he had for months been absent, and residing at a distance of fifty or sixty miles from this place. The respondent, then, having obtained a postponement of the cause for the avowed purpose of introducing further evidence to the merits, instead of employing the time in procuring the evidence, seeks an interview with the prochein ami and privately settles the suit by paying to him such sum for wages as was agreed upon between them, without the knowledge of the minor's counsel or friends, or even of his own counsel, and after stripping his child of his four months' earnings, discharges the action and leaves him to settle his own costs in the best manner that he can. I imagine if he had consulted his own counsel he would have admonished him that there was some hazard in taking a step of this kind. If the terms of the settlement had been reasonable, and the costs had been provided for, the least that the court could have done, would have been to hold the action until it saw that the money was appropriated to the use of the libellant. But under the circumstances of this case, the money having been so manifestly paid by the respondent in his own wrong, I think it my duty to proceed as though nothing had been done.

If the views which I have taken of these preliminary matters are correct, the case upon its merits may be disposed of in a few words. The libellant having signed no shipping articles, claims under the act of congress of July 20, 1790, § 1 [supra], for the government of seamen in the merchant service, the highest rate of wages that was paid at this place, at any time within three months before the engagement. No evidence has been introduced showing what was the highest rate of wages for boys of his age. Prime seamen obtained eighteen dollars a month. The libellant was, at the time of the service,

about eighteen years of age, small of his age, but active, intelligent, and trustworthy; capable of doing in some parts of the ship's service, perhaps as much as a man, but probably in the laborious part of the service, not so much. It is a circumstance which speaks strongly in favor of his character and capacity, that he was taken to supply the place of the mate, who had absconded. Though he was not shipped as mate, nor expected to do a mate's duty, it cannot be supposed that he would have been taken in such a case, unless he was capable of performing the duty at least of an ordinary seaman. I am satisfied that I shall not exceed the measure of a just compensation by pronouncing for wages at the rate of fifteen dollars a month.